Brinkerhoee, C. J.
The bill of lading on which the plaintiff brought his action, is as follows:
“ The steamer Jonas Powell received for transportation in good ■order, from S. Thompson, the following articles, which are to’ be delivered, without delay, to consignees as per margin below. Freight ■to Philadelphia, 85 cts. per 100.
“ Dated at McConnellsville, April 19, 1861.
“ Marks.
“ S. Thompson Thil. Care of Eplar & Cress

Articles.

54 bbls. eggs, 3,930 doz.
Weight, 7,WO.
“ D. H. Morteey, Clerk.’
*95 *That this paper constitutes a special contract for the safe delivery, without delay, of the eggs to the agents of the consignor at Philadelphia, unless the same be prevented by inevitable accidents or public enemies, for a breach of which the owners of the steamer would be liable to the shipper, will hardly be questioned. And the fact that the steamer was accustomed to run, and was capable of running, but a part of the distance over which the property shipped was, by the terms of the contract, to be transported, could in that case make no difference as to the liability; for where a party assumes, by special contract, the transportation of goods, it is for him to look to his means of transport, and he is responsible for such means as he may see proper to employ.
The owners of the steamer, then, being prima facie liable for the fulfillment of this contract, the leading question in the case arises, which is, whether the action lies, under the wateu-eraft law, against the craft by name .instead of the owners, for a default occurring beyond the line of customary or even possible navigation by the craft on which the shipment was primarily made? This question involves the'construction of the statute.
The amendatory act of March 10,1860, “ to provide for the collection of claims against steamboats and other water-crafts, and authorizing proceedings against the same by name ” (4 Curwen’s Stat. 3399), provides:
“That all steamboats, and other water-crafts of twenty tuns burden, and upward, navigating the waters within or bordering upon this state, shall be liable, and such liability shall be a lien thereon, for all debts contracted on account thereof, by the master, owner, steward, consignee, or other agent for materials, supplies, or labor in the building, repairing, furnishing, or equiping the same; or for insurance, or dues for wharfage; and also for damages arising out of any contract for the transportation of any goods or persons, or for injuries done to persons or property by such craft, or for any damages or injury done by the captain, mate, or other officer thereof, or by any person, under the order or sanction of either of them, to any person who may be a passenger or hand on such steamboat or other water-craft, at the time of the infliction of such damage or injury. *And also for damages arising out of any contract for the transportation of any goods,” etc. This language, taken literally and as it stands, is certainly broad enough to cover the contract sued on by the plaintiff below, and so it must be taken, unless there *96 Tbe some rule of construction, or some policy indicated by the general scope of the act, to limit its literal provisions and their application. And we do not know of any such rule of construction, nor' are we able to see in the act itself any indications of such a policy. The statute is a remedial one, and as such is to be liberally construed for the attainment of the ends at which it aims. The navigable waters within and bordering on Ohio extend to great distances, to other states, and to foreign countries. The owners of crafts visiting and doing business in our waters were often unknown-to persons dealing with them, numerous, widely scattered, and difficult to reach; and the leading and obvious policy of the act is, in respect to the liabilities named in it, to substitute the craft itself for-the owners, whoever and wherever they might be. We believe it is not uncommon for a kind of partnerships, or “ lines,” so called, to be formed and operated by different parties, corporate and natural, for the transportation of persons and goods over great distances- and when neither one of the parties to such combination has within himself or itself alone the means to perform what they are accustomed to contract for, and to accept pay for. Such “lines” are a public convenience. And we can see no reason why the owners of a steamer should not be a party to such combined operations, nor-why, if they assume to contract as if they are members of such a. line, whether they are in fact so or not, their craft should not, under both the letter and policy of the statute, be liable for a failure-to fulfill the contract.
It is scarcely necessary to say that this case is readily distinguishable from one in which a railroad corporation may have assumed to contract for the transportation of persons or goods to-points beyond the line of its road. In such case, a question of corporate power so to contract might be raised, which would depend upon the grants of corporate power conferred by legislation in the-particular case. But here there +can be no question as to-the power of steamboat owners to contract as they have done, and we are satisfied of the legislative intent to substitute the craft for-the owners, at the option of the party aggrieved, in cases of this-kind.
By the evidence in the case as set out in the bill of exceptions,, we are very well satisfied that there is no negligence chargeable-upon the steamer in causing the eggs to be forwarded by way of the Baltimore and Ohio Eailroad; and it is also apparent that they *97 arrived in Baltimore in due time. It is also very clear that, on the arrival of the eggs at Baltimore, and for several days thereafter,, railroad transportation between that city and Philadelphia was' broken up and interrupted by public enemies and the military measures properly consequent thereon. But there was evidence before the jury tending to show that there were means of transportation, by water between the two cities, which were open and available, and of which the agents of the Baltimore and Ohio Company did not avail themselves with the promptitude which a due regard to the interests of the plaintiff below required and which delay resulted in loss to him. But the conflicting evidence on this point seems to have been fairly submitted to the jury, aiid we do not feel warranted in disturbing their finding on the question of fact.
Some stress, in argument, is laid on the circumstance which appears in evidence, that, prior to the shipment of these eggs, a secret contract existed between the plaintiff below and the Baltimore and Ohio Railroad Company, by which he was bound to forward all his freight destined to Philadelphia by way of that company’s road,, and thence by the Wilmington road to the former city. But we do-not see how a contract between the plaintiff below and the Baltimore and Ohio Railroad Company, to which neither the steamer1 nor her owners were a party, can affect his rights under an independent special contract between him and the steamer—especially as, in the decision of the case, we proceed on the assumption that the steamer was chargeable with no wrong in forwarding the freight, by the Baltimore and Ohio line.

Judgment affirmed.

Scott, Day, White, and Welch, JJ., concurred.